E-FILED
Tuesday, 03 May, 2022  03:53:16 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

| | |
|---|---|
| **DEJUAN ALEXANDER,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 18-2290** |
| ) | |
| **THE CITY OF DANVILLE, ILLINOIS,** ) | |
| **et al.,** ) | |
| ) | |
| **Defendants.** ) | |

## OPINION AND ORDER

**SUE E. MYERSCOUGH, U.S. DISTRICT JUDGE:**

Before the Court is a Motion for Summary Judgment (d/e 71) submitted by Defendants the City of Danville, Illinois ("Danville" or "the City"), Dawn Hartshorn, Phil Wilson, Travis Spain, Joshua Edington, Joshua Campbell, Scott Damilano, Brian Lange, Patrick Carley, Troy Hogren, Danielle Lewallen, and Unidentified Employees of the City of Danville ("Officers") (collectively, "Defendants"). Also before the Court is Defendants' Motion to Strike Portions of Plaintiff DeJuan Alexander's Response (d/e 79). Defendants seek summary judgment on each of Plaintiff's claims arising under 42 U.S.C. § 1983. Defendants are entitled to qualified immunity on Plaintiff's §

1983 unlawful pretrial detention claim.  Further, Plaintiff's state law claims fail as a matter of law because no constitutional violation occurred.  Defendants' Motion for summary Judgment (d/e 71) is, therefore, GRANTED.  Finally, because the Court can conclude the appropriateness of Plaintiff's responses to Defendants' statement of facts without striking those lengthy portions of Plaintiff's Response, Defendants' Motion to Strike (d/e 79) is DENIED.

## I.   JURISDICTION

This Court has subject-matter jurisdiction over Counts I, II, III, and IV of Plaintiff's Complaint because they are claims under 42 U.S.C. § 1983.  See 28 U.S.C. § 1331; see also 28 U.S.C. § 1343(a)(3) ("The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person to redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States.")

The Court also has subject-matter jurisdiction over Plaintiff's Illinois state law claims under the Court's authority to invoke

supplemental jurisdiction, see 28 U.S.C. § 1367.  In addition to supplemental jurisdiction, the Court also has subject-matter jurisdiction over the state law claims under the Court's diversity jurisdiction.  Under 28 U.S.C. § 1332, the Court "shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000 . . . and is between citizens of different States."  In this case, Plaintiff is a resident of the State of Indiana and all Defendants are residents of the State of Illinois. While Plaintiff does not specifically allege the amount in controversy in this case is over $75,000, Defendants have not contested the issue.  Courts will not dismiss claims for failure to adequately plead the amount in controversy unless it "appear[s] to a legal certainty that the claim is really for less than the jurisdictional amount." Rexford Rand Corp. v. Ancel, 58 F.3d 1215, 1218 (7th Cir. 1995) (quoting St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283, 289 (1938)); Jump v. Schaeffer & Assocs. Ins. Brokerage, Inc., 123 Fed.Appx. 717, 719 (7th Cir. 2005).  Plaintiff has alleged that he was wrongfully imprisoned pending trial for four years.  The Court finds that Plaintiff has adequately alleged an amount in controversy of more than $75,000.  Therefore, the Court finds that the Court

has jurisdiction over Counts V, VI, VII, and VIII under the Court's diversity jurisdiction as well as under supplemental jurisdiction.

## II.  BACKGROUND

### a. Motion to Strike

In Defendants' Motion to Strike, Defendants ask the Court to strike 38 of Plaintiff's 44 responses to Defendants' Statement of Undisputed Material Facts ("DSUMF") and the first 20 pages of the Argument section of Plaintiff's Response, and to deem Defendants' Undisputed Facts admitted.  Defendants argue that the Court's Local Rules require the Court deem admitted improperly disputed material facts and strike argumentation within factual responses. The Court disagrees.

Motions to strike are typically disfavored, and the Court will only grant such a motion if it is clear that the material to be struck "can have no possible bearing on the subject matter of the litigation."  Swanson v. Murray Bros, LLC, No. 19-cv-3220, 2020 WL 2857562, at *1 (C.D. Ill. June 2, 2020) (quoting Anderson v. Bd. of Educ. of City of Chicago, 169 F. Supp. 2d 864, 867 (N.D. Ill. 2001)).  Instead, the Court will generally "rely on its own ability to consider only arguments and facts which are properly presented"

and will pass over without consideration those not properly

presented.  <u>Nuzzi v. St. George Cmty. Consol. Sch. Dist. No. 258</u>,

688 F.Supp.2d 815, 830 (C.D. Ill 2010).

Local Rule 7.1(D)(2)(b) governs how parties are to file

responses to motions for summary judgment.  That Rule provides

the following instructions for how a non-moving party, in a separate

subsection of its brief, is to respond to the moving party's stated

undisputed material facts,

> List by number each fact from Section B of the
> motion for summary judgment which is
> conceded to be material but is claimed to be
> disputed. Each claim of disputed fact must be
> supported by evidentiary documentation
> referenced by specific page. Include as exhibits
> all cited documentary evidence not already
> submitted by the movant.

Civ. LR 7.1(D)(2)(b)(2).  The Local Rules further provide that the

non-moving party's arguments and responses to the moving party's

arguments are to be contained in another separate argument

subsection of the non-moving party's brief,

> The response must include the following
> sections . . . (b) Response to Undisputed
> Material Facts . . . (c) Argument: With or
> without additional citations to authorities,
> respond directly to the argument in the motion
> for summary judgment.

Civ. LR 7.1(D)(2)(b)–(c).

While the Court notes that Plaintiff's Responses to DSUMF ("PRSUMF") improperly present arguments and additional facts in violation of the Local Rules, the Court declines to strike the offending portions and will instead evaluate each one individually. For example, Defendants assert the following fact as material and undisputed,

> That same day, Hogren and Lange interviewed McGuire, who was one of the seven occupants from the white Escalade. McGuire advised the detectives that he drove from Indianapolis to Danville in a Jeep with two MRC rappers named "Khaos" and "Yella." McGuire left Deuce's when the fights in the bar started and tried to hide in the Jeep that he came in, but never saw "Khaos," "Yella," or anyone else from MRC at that time. Seeing that no one else was coming to the Jeep, McGuire ended up getting in the white Escalade with the other occupants that left the scene at Deuce's. Additionally, McGuire advised the detectives that "Khaos" has gold teeth and wore a shirt with a design on it. See Ex. 5, at ¶9; see also Danville Police Supp. Report (Det. Hogren/Lane), attached as Exhibit 15.

DSUMF ¶ 27. Plaintiff's response to that statement is,

> Disputed. These statements are neither a full nor accurate recitation of the facts most favorable to the nonmoving party. McGuire

> also told Hogren that he never saw "Khaos"
> with a gun and never saw a confrontation. (Ex.
> 15, at 2).

PRSUMF at ¶ 27.  Plaintiff's response is improper.  First, it incorrectly states the legal standard, as explained more fully below, as viewing "the facts most favorable to the non-moving party."  The correct standard on summary judgment is viewing "the facts <u>in the light</u> most favorable to the non-moving party."  <u>Woodruff v. Mason</u>, 542 F.3d 545, 550 (7th Cir. 2008) (emphasis added).  Second, and more importantly, the presence of this legal argument is improper because it is legal argumentation within a section devoted only to facts.  Third, and finally, Plaintiff's proffered dispute is no dispute at all.  Plaintiff argues that Plaintiff is seeking to provide context to Defendants' statement of fact, and accordingly disputes Defendants' statement.  But providing context to a statement of fact and disputing the fact are distinctly different and not mutually exclusive.  Plaintiff's response merely contains additional facts, which the Court can consider in addition to Defendants' statement.

Each of Plaintiff's fact-responses that Defendants request the Court strike contain similar faults.  <u>See</u> PRSUMF at ¶¶ 22–29, 31–43, 45–48, 50–51, 54–62, 65–74, 76.  While the Court notes that

these are technically against the Court's Local Rules, the Court
declines to strike the responses "out of an abundance of caution"
because the responses contain additional facts and this is now the
summary judgment stage of the case.  See Shreffler v. City of
Kankakee, No. 19-cv-2170, 2021 WL 6200764, at *13 (C.D. Ill. Sep.
28, 2021) (declining to strike potentially relevant information at the
summary judgment stage).  For the same reasons, the Court
declines to strike the first 20 pages of Plaintiff's Response (d/e 75).
Instead, the Court will "rely on its own ability to consider only
arguments and facts which are properly presented" and will pass
over without consideration those not properly presented.  Nuzzi,
688 F.Supp.2d at 830.  Defendants' Motion to Strike (d/e 79) is
DENIED.

### b. Facts

The Court draws the following facts from the parties'
statements of material facts, taking into account each party's
objections thereto.  The Court discusses material factual disputes, if
any, in its analysis.  Any fact submitted by any party that was not
supported by a citation to evidence will not be considered by the
Court.  See Civ. LR 7.1(D)(2)(b)(2).  In addition, if any response to an

allegedly disputed fact is unsupported by evidentiary documentation, that fact is deemed admitted.  <u>Id.</u>  Lastly, as stated above, any response containing only argumentation without actual factual dispute will not be considered.

Defendants Phil Wilson, Travis Spain, Joshua Edington, Joshua Campbell, Scott Damilano, Brian Lange, Patrick Carley, Dawn Hartshorn, Troy Hogren, and Danielle Lewallen (collectively "Defendants") were all employed with the City of Danville, which is also a named Defendant in this case, within the City's police department in March 2014.  Def.'s Undisputed Material Facts ("DUMF") (d/e 75) ¶ 5.

On March 15, 2014, Plaintiff DeJuan Alexander, a Black man, travelled from Indiana to Danville, Illinois to perform at a rap concert at a bar called Deuce's.  <u>Id.</u> ¶ 8.  Plaintiff used the pseudonym "Khaos" when performing.  <u>Id.</u> ¶ 2, 31.  That night, Plaintiff drove a maroon Jeep Commander, wore red jeans and a tan shirt with a colorful image of a dreamcatcher on the front, and who was six-feet, three-inches tall and weighed roughly 280–300 pounds.  <u>Id.</u> ¶¶ 2, 10, & 11.  Plaintiff traveled to Deuce's with Darnell Evans, also called "Yella," Keenan Thomas, Travis McGuire,

William King, also called "Scooty," Jason Reed, and George Haynes. Id. ¶ 12. Plaintiff parked in a nearby Auto-Zone parking lot when he arrived because the Deuce's parking lot was full. Pl.'s Additional Material Facts ("PAMF") (d/e 75) ¶ 6.

At Deuce's, Plaintiff performed along with King and Evans. Plaintiff performed for no more than fifteen minutes. DUMF ¶ 12. When the performance was over, a fight broke out near the stage. Id. ¶ 13. As the patrons of Deuce's left the bar, fights also began to break out in the parking lot with people running from the bar. PAMF ¶ 15. Two people were shot in the chaos: Demaree Tetter and Sheldon Pittman. DUMF ¶ 16 & 51. Tetter was shot in the chest and died that night while Pittman was shot in the hand and survived. Id.

Officers Spain and Edington were already at Deuce's at the time of the shooting, though Spain testified that he arrived at Deuces at around 10:00 or 11:00 p.m. DUMF ¶ 14; Ex. 10 16:13–23. While officer Spain was responding to a fight, a man named John Ervin approached Spain and told Spain that Ervin saw a man with a gun in the parking lot. Id. ¶ 15. Officer Eddington was also told that there was a shooting in the parking lot and ran to the

parking lot where Eddington found Pittman and Tetter.  Id.  At some point, Edington called over the police radio that there were fights breaking out.  Id. ¶ 19.  Officer Carley responded at around 1:30 a.m. at which time Carley heard gunshots.  Id. ¶ 51.  Detective Hogren also stated that Hogren heard a report at 1:30 a.m. of a shooting at Deuce's.  Ex. 5 ¶ 5.  Officer Edington was told that the shooter left in a white Cadillac Escalade with Indiana license plates, while officer Carley was told that the shooter left in a maroon SUV. DUMF ¶¶ 17 & 20.

Law enforcement stopped a white Escalade with Indiana license plates shortly thereafter.  DUMF ¶ 21.  The occupants of the Escalade—Travis McGuire, George Haynes, Alberto Wilmont, Jr., Jacob Hall, Joshua Roberts, Jason Reed, and William King—were taken into police custody and transported to the Danville Public Safety Building for questioning.  Id. ¶ 22 & 23.  The group arrived at the Public Safety Building at around 1:50 a.m.  Id. ¶ 27; Ex. 5 ¶ 7.

Detectives Hogren and Lange then interviewed Travis McGuire at the Public Safety Building at around 9:00 a.m. on March 16, 2014.  DUMF ¶ 27; Ex. 15; Ex. 5 ¶ 9.  McGuire told Hogren and

Lange that McGuire came to Danville from Indianapolis in a red Jeep with two other rappers named Khaos and Yella.  Ex. 15. McGuire also stated that Khaos was the driver of the Jeep and described Khaos as "dark skinned" with "short hair."  Id.  McGuire then stated that Khaos "had gold in his teeth and [Khaos] was wearing a shirt with a design on it."  Id.  Detectives Hogren and Lange also interviewed Roberts at the Public Safety Building later that morning at 11:15 a.m.  Ex. 5 ¶ 11; Ex. 67.  Roberts stated that Khaos had gold teeth.  Id.

Detective Wilson and Officer Spain also talked with John Ervin soon after the shooting at around 3:00 a.m. on March 16, 2014 at the Public Safety Building.  Ex. 13.  At that time, Ervin stated[1] that Ervin saw a large White man with a beard and black braids hand a Black man a gun.  Id.  Ervin told Wilson and Spain that the Black man pointed the gun at Demaree Tetter and that was when Ervin

---

[1] Plaintiff, in his Response to Defendants' Statement of Undisputed Facts, argues that "Ervin's statement was completely fabricated by Detective Wilson and Officer Spain" and should, therefore, be disregarded.  Pl.'s Resp. (d/e 75) p. 7–8.  However, as explained further below, Plaintiff has not presented any evidence of fabrication and does not cite to any exhibits to support that assertion.  See generally id.  Without any supporting evidence cited at the summary judgment stage, and as explained more fully below, the Court cannot accept Plaintiff's assertion that Ervin's statement was "completely fabricated."

said he decided to run to tell Spain, who was breaking up a fight at the time, that there was someone with a gun.  Id.  Ervin told the officers that he saw the man with the gun leave in a white Jeep with Indiana license plates and saw another white Cadillac Escalade also leaving.  Id.  Ervin stated that he thought a picture of Travis McGuire looked like the man with the gun if McGuire would have had gold teeth.  Id.  Ervin instead described the man with the gun as around six-feet tall, around 230–250 pounds, having short hair, having gold teeth, wearing a red or gray shirt with red sleeves and "some type of old painting on the front," red or gray shoes, and blue jeans.  Id.

The next day, on March 17, 2014, Wilson again interviewed Ervin.  Ex. 22.  In that interview, Wilson showed Ervin a photo array of six photos, one of which was of Plaintiff.  Id.  Ervin identified Plaintiff's picture as the picture of the man with the gun at Deuce's.  Id.

Detective Lange also interviewed the surviving victim, Sheldon Pittman, twice, first on March 16, 2014 shortly after the shooting and again on March 17, 2014 at about 9:50 a.m.  Exs. 21 & 57.  In the first interview, made while Pittman was still in the emergency

room, Pittman stated that a Black man was the shooter but could not describe the shooter at the time. Ex. 57. Pittman also mentioned a man with braids was on the scene. Id. At the March 17 interview the next morning, Detective Lange showed Pittman a photo array in which one of the pictures was of Plaintiff. Ex. 21. Pittman picked the photo of Plaintiff out of the array, though Pittman stated that he could not say for sure Plaintiff was the shooter. Id.

Detective Damilano interviewed Ashely Darnell shortly after the shooting on March 16, 2014 at 5:45 a.m. Ex. 62. Darnell told Detective Damilano that she was inside Deuce's when the shooting happened and that she did not directly witness the shooting. Id. Darnell also stated that she was told by her cousin, Cedric Halthon, that the shooter was a man named Sadi, but that Darnell did not know Sadi's last name or whether Halthon's accusation was correct. Id.

Detective Lange then interviewed Cedric Halthon at 3:45 p.m. on March 17, 2014. Ex. 25. Halthon told Detective Lange that a Black man who was "on stage with the guys from Indiana . . . pulled a gun on Terrance Liggins and [JuJuante] Newell." Id. Halhton told

Lange that the gun initially jammed.  Id.  Halthon stated that Damaree Tetter approached the man and "started talking shit" to the man with the gun and that was when the shooter started firing the gun.  Id.  Halthon stated that the shooter was from Indianapolis and that the shooter had a "red hoodie with a skull cap on" and "was one of the ones on the stage with the rapper."  Id.  Detective Lange then showed Halthon a six-photo array, including a photo of Plaintiff, and Halthon identified Plaintiff as the shooter, stating Halthon "would never forget that face."  Id.

Detectives Hogren, Lewallen, and Wilson interviewed Timothy and Terrance Liggins on March 17, 2014, all of whom were at Deuce's at the time of the shooting.  Exs. 23, 24, & 29.  Timothy Liggins told Detective Holgren that one of the rappers at Deuce's was the shooter.  Ex. 23.  Timothy Liggins stated that the shooter was Black, around six-feet tall, 250 pounds, in his late twenties, was wearing a sweater with some type of design on the front, had on blue jeans, and had four to six gold teeth.  Id. p. 1.  Terrance Liggins told Lewallen that the shooter came from the Auto Zone parking lot, had a "whitish, blue and red shirt with gold in his mouth," and was heavy set with a haircut.  Ex. 24.  Terrance

Liggins also stated that after the shooter shot Tetter and Pittman, the shooter left in a maroon Jeep.  Id. p. 2.  Terrace was then shown a picture of a maroon 2007 Jeep Commander, and Terrance told Lewallen that the car in the picture looked like the one the shooter left in.  Id.  Finally, both Terrance and Timothy Liggins picked Plaintiff's photo when presented with a six-photo array and were asked to identify the shooter. Exs. 23 & 24.

Finally, Detective Wilson interviewed JuJuante Newell on March 17, 2014 at 3:30 p.m.  Ex. 29.  Newell was at Deuce's the night of the shooting and told Wilson that Newell was a witness to the shooting.  Id.  Newell stated that the man who shot Tetter first threatened to shoot Newell, but the gun misfired.  Id.  When Newell was pulled by his girlfriend to the ground, Newell stated that he heard gunshots and saw Tetter on the ground.  Id.  Newell said that he then saw the shooter walking towards the Auto Zone.  Id.; Ex. 86 p. 3–4.  When Detective Wilson presented Newell a six-photo array including a photo of Plaintiff, Newell identified Plaintiff as the shooter.  Ex. 29.; Ex. 86 p. 5.

A warrant was then issued for the arrest of Plaintiff Dejuan Alexander on March 17, 2014 by a judge in the Fifth Judicial

Circuit Court in Vermillion County Case Number 2014-CF-000114.

Ex. 82.  Plaintiff was arrested on March 18, 2014.  DUMF ¶ 1.

Plaintiff's case went to trial first in October 2016, four years after

his arrest.  Id. ¶ 53.  The first trial ended in a mistrial.  Id.

Plaintiff's second trial was held in February 2018.  Id. ¶ 63.  That

trial ended in Plaintiff's acquittal.  Id.

### c. Procedural History

Plaintiff filed his first Complaint against Defendants on

November 2, 2018.  See (d/e 1).  In that first Complaint, Plaintiff

claimed that his arrest, detention, and trial amounted to various

violations of federal law under 42 U.S.C. § 1983 including: one

count of violations of due process under the Fourteenth

Amendment, one count of "Deprivation of Liberty without Probable

Cause" under the Fourth and Fourteenth Amendments, one count

of "Unduly Suggestive Identification Procedures" in violation of the

Fourteenth Amendment, one count of failure to intervene to prevent

the alleged violations of Plaintiff's Constitutional rights, one count

of conspiracy to deprive Plaintiff of his Constitutional rights, and

one count of unconstitutional policymaking by the City (under

Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658

(1978)).  <u>See</u> Compl. (d/e 1).  Plaintiff also alleged various state law violations, including malicious prosecution, intentional infliction of emotional distress, respondeat superior, and indemnification.  <u>Id.</u>

Defendants filed a Motion to Dismiss (d/e 20) on January 11, 2019.  The Court granted in part and denied in part that motion, dismissing Plaintiff's claims under the Fourteenth Amendment because Plaintiff was acquitted at his second trial, so Plaintiff could not show a due process violation under <u>Lewis v. City of Chicago</u>, 914 F.3d 472 (7th Cir. 2019).  <u>See</u> Op. (d/e 31) p. 11.  The Court further held that Plaintiff's claim of "Deprivation of Liberty without Probable Cause" remained to the extent that claim alleged wrongful pretrial detention and was based on the Fourth Amendment.  <u>Id.</u> The Court then granted Plaintiff leave to amend or supplement that claim.  <u>Id.</u>

Plaintiff then filed an Amended Complaint (d/e 32) in which he alleged the following counts: Count I "Deprivation of Liberty without Probable Cause" in violation of the Fourth Amendment; Count II Failure to Intervene in violation of Plaintiff's Constitutional rights; Count III Conspiracy to Deprive Constitutional Rights; Count IV Municipal Policy Claim alleging the City failed to train, supervise, or

discipline its police officers; Count V Malicious Prosecution; Count
VI Intentional Infliction of Emotional Distress; Count VII
Respondeat Superior; and Count VIII Statutory Indemnification
under 745 ILCS 10/9-102.

### III.  LEGAL STANDARD

Summary judgment under Rule 56 is appropriate "if the
movant shows that there is no genuine dispute as to any material
fact and the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a).  On such a motion, the facts and all
reasonable inferences derived therefrom are viewed in the light most
favorable to the non-moving party.  Scott v. Harris, 550 U.S. 372,
380 (2007); Blasius v. Angel Auto., Inc., 839 F.3d 639, 644 (7th Cir.
2016) (citing Cairel v. Alderden, 821 F.3d 823, 830 (7th Cir. 2016)).

A genuine dispute as to any material fact exists if the evidence
is such that a reasonable jury could return a verdict for the non-
moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248
(1986).  The moving party bears the burden of establishing that
there is no genuine dispute as to any material fact.  See Celotex
Corp. v. Catrett, 477 U.S. 317, 323 (1986); Modrowski v. Pigatto,
712 F.3d 1166, 1168 (7th Cir. 2013) (explaining that Rule 56

"imposes an initial burden of production on the party moving for summary judgment to inform the district court why a trial is not necessary" (citation omitted)).  After the moving party does so, the non-moving party must then go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 255 (quotation and footnotes omitted). Summary judgment is only warranted when the moving party carries its initial burden and the non-moving party cannot establish an essential element of its case on which it will bear the burden of proof at trial.  Kidwell v. Eisenhauer, 679 F.3d 957, 964 (7th Cir. 2012).  "[S]ummary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events."  Johnson v. Cambridge Indus., Inc., 325 F.3d 892, 901 (7th Cir. 2003).

## IV.   ANALYSIS

Defendants first seek summary judgment on Plaintiff's claims under 42 U.S.C. § 1983.  Defendants argue that they are entitled to qualified immunity as to the § 1983 claims brought under the Fourth Amendment because Defendants had at least arguable probable cause to arrest and charge Plaintiff.  In response, Plaintiff

argues that Defendants did not have probable cause and, even if Defendants did, that probable cause was either predicated on fabricated evidence or negated as the investigation into the shooting continued.

Generally, the doctrine of qualified immunity is a shield police officers may use when faced with a suit for damages under 42 U.S.C. § 1983 in which a plaintiff claims constitutional violations. Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  Whether an officer is entitled to qualified immunity "involves a two-pronged inquiry: (1) whether the facts, read in favor of the of the non-moving party, amount to a constitutional violation; and (2) whether the constitutional right was clearly established at the time of the alleged violation."  Rainsberger v. Benner, 913 F.3d 640, 647 (7th Cir. 2019) (Barrett, J.).  Put another way, "officers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'"  Dist. of Columbia v. Wesby, 138 S.Ct. 577, 589 (2018) (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012)).  Qualified immunity protects "all but the plainly

incompetent or those who knowingly violate the law." Burritt v. Ditlefsen, 807 F.3d 239, 249 (7th Cir. 2015) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

The Court need not always address both questions in the qualified immunity analysis. Pearson v. Callahan, 555 U.S. 223, 236–42 (2009). "[I]f the law was not clearly established, there is no need to tackle the (often harder) question whether the challenged conduct violated the Constitution." Rainsberger, 913 F.3d at 647. But where the law was clearly established, both qualified immunity questions must be addressed. Id.

As stated in the Court's previous order on Defendants' Motion to Dismiss, Plaintiff's claims can only sound in the Fourth Amendment because Plaintiff was acquitted. Op. & Order (d/e 31) pp. 9–11 (citing Lewis v. City of Chicago, 914 F.3d 472, 479 (7th Cir. 2019)). Rather than due process claims under the Fourteenth Amendment, Plaintiff's § 1983 claims may only be brought under the Fourth Amendment's prohibition on unlawful pretrial detention. Id. Accordingly, the Court's qualified immunity analysis examines only those issues sounding under the Fourth Amendment and does not extend to Plaintiff's due process claims.

The Fourth Amendment protects a person's right to be free from unreasonable searches and seizures.  Pretrial detention is a 'seizure' and is "'justified only on probable cause' to believe the detainee has committed a crime." Young v. City of Chicago, 987 F.3d 641, 644 (7th Cir. 2021) (quoting Lewis, 914 F.3d at 477). "There is no question that [Plaintiff's] constitutional right to be free from arrest without probable cause was clearly established at the time of [his arrest]." Fleming v. Livingston Cty., Ill., 674 F.3d 874, 879 (7th Cir. 2012).  Therefore, the 'clearly established' prong of the qualified immunity inquiry is met.  The only question that remains is "whether the facts, read in favor of the of the non-moving party, amount to a constitutional violation." Rainsberger, 913 F.3d at 647.  As this case presents a claim of wrongful pretrial detention in violation of the Fourth Amendment, the question may also be understood as whether there was probable cause to arrest Plaintiff because "[p]robable cause to arrest is an absolute defense to any claim under Section 1983 against police officers for" unlawful pretrial detention.  Burritt, 807 F.3d at 249 (quoting Mustafa v. City of Chicago, 442 F.3d 544, 547 (7th Cir. 2006)).

### a. Defendants are entitled to qualified immunity as to Plaintiff's § 1983 claim of unlawful pretrial detention because probable cause existed to arrest and detain Plaintiff.

"Probable cause is not a high bar." Wesby, 138 S.Ct. at 586 (internal citation and quotation omitted). "Probable cause is established by a reasonable belief that a person committed a crime." Phillips v. Allen, 668 F.3d 912, 914 (7th Cir. 2012) (citing Illinois v. Gates, 462 U.S. 213 (1983)). "A police officer has probable cause to arrest when, at the moment the decision [to arrest] is made, the facts and circumstances within [the officer's] knowledge and of which [the officer] has reasonably trustworthy information would warrant a prudent person in believing that the suspect has committed or was committing an offense." Fleming, 674 F.3d at 878–79 (quoting Qian v. Kautz, 168 F.3d 949, 953 (7th Cir. 1999)). What's more, the probable cause inquiry "does not require that the officer's belief be correct or even more likely true than false, so long as it is reasonable." Id. The inquiry "does not take each fact in isolation; it depends on the totality of the circumstances." Rainsberger, 913 F.3d at 648. The question of probable cause is only a question for a jury "if there is room for a

difference of opinion concerning the facts or the reasonable inferences to be drawn from them." <u>Maxwell v. City of Indianapolis</u>, 998 F.2d 431, 434 (7th Cir. 1993).

When evaluated under the assertion of qualified immunity, the bar is still lower. "Although closely related, a determination of actual probable cause is separate and distinct from a determination of what is sometimes referred to as 'arguable probable cause' for qualified immunity purposes." <u>Burritt</u>, 807 F.3d at 250 (citing <u>Fleming</u>, 674 F.3d at 880). "Arguable probable cause is established 'when a reasonable police officer in the same circumstances and with the same knowledge and possessing the same knowledge as the officer in question <u>could</u> have reasonably believed that probable cause existed in light of well-established law.'" <u>Fleming</u>, 674 F.3d at 880 (quoting <u>Humphrey v. Staszak</u>, 148 F.3d 719, 725 (2012)) (additional citation and internal quotation omitted) (emphasis in original). The presence of arguable probable cause at the time of arrest entitles defendant officers to qualified immunity for § 1983 claims arising under the Fourth Amendment. <u>See Burritt</u>, 807 F.3d at 249–250; <u>Fleming</u>, 674 F.3d at 880. Furthermore, "[t]he fact that criminal charges are eventually dropped or the complaining witness

later recants has no consideration in the determination of arguable probable cause at the time of arrest." Fleming, 674 F.3d at 249. Therefore, the precise question before the Court is whether, at the time of Plaintiff's arrest and presented with the facts then-known, a reasonable officer could have mistakenly believed that probable cause existed to arrest Plaintiff for the murder of Demaree Tetter and the shooting of Sheldon Pittman. Burritt, 807 F.3d at 250.

The Court answers that question in the affirmative. The facts supporting the existence of actual probable cause, never mind arguable probable cause, are straight-forward: multiple interviews were performed by multiple witnesses who told different officers a similar set of facts. They told officers that, after the chaos of the fights at Deuce's spilled into the parking lot, a Black man shot Tetter and Pittman. Ervin, Timothy Liggins, and Terrance Liggins all described the shooter as a Black man approximately six-feet tall and either heavy-set or around 250 pounds and with gold teeth. Timothy Liggins and JaJuante Newell also told officers that the shooter came from the Auto Zone parking lot and then returned to the Auto Zone parking lot after the shooting. Terrance Liggins also told officers that the shooter left in a maroon Jeep, a statement

Officer Carley also heard when he arrived at Deuce's.  All of those facts as received by the officers fit the description of Plaintiff that night.  Travis McGuire, who had travelled from Indianapolis to Danville with Plaintiff—a roughly hour-and-a-half drive—described Plaintiff as begin dark-skinned, having short hair, and having gold in his teeth the night of the shooting.  Moreover, Ervin, Pittman, Timothy Liggins, Terrance Liggins, and Newell all chose Plaintiff's picture from photo arrays as depicting the shooter, though Pittman was not certain.  Lastly, and perhaps most significantly, an Illinois Fifth Judicial Circuit judge found probable cause and issued a warrant to arrest Plaintiff on March 17, 2014, the day before he was arrested.  When analyzed as a whole, the Court finds that a reasonable officer could have, even mistakenly, believed that probable cause existed to arrest and detain Plaintiff.  Moreover, the breadth of evidence before Defendants when making the probable cause determination prior to Plaintiff's arrest shows that there is no room for a difference of opinion concerning whether actual probable cause was established.  As a result, Defendants are entitled to qualified immunity.

### i. Plaintiff's arguments against probable cause are without merit.

Plaintiff argues that Defendants did not have either arguable or actual probable cause to arrest and detain Plaintiff, so Defendants are not entitled to qualified immunity.  Plaintiff's arguments are four-fold: that the evidence supporting Defendants' probable cause determination and the evidence which formed the basis of the arrest warrant was fabricated by Defendants, that the probable cause determination made at the time of arrest was then negated by evidence collected from further investigation after Plaintiff's arrest, that the photo arrays used in the witness interviews were unduly suggestive, and that Defendants withheld certain impeachment evidence in violation of their disclosure obligations under Brady v. Maryland, 373 U.S. 83 (1963).

### 1. Fabrication of evidence

To establish fabrication of evidence to determine probable cause, Plaintiff must "present evidence that [Defendants] deliberately submitted false testimony or recklessly disregarded the truth." Fleming, 674 F.3d at 881.  The falsification must also be material to the probable cause determination.  Id.  Plaintiff has not

presented any evidence to prove that the evidence which formed probable cause to arrest Plaintiff on March 18, 2014 was fabricated. Plaintiff repeatedly states that all of the statements made by John Ervin, Terrance Liggins, Timothy Liggins, Cedric Halthon, and JuJuante Newell were fabricated by Defendants.  But Plaintiff does not submit any evidence to support that assertion.  Instead, Plaintiff points to later testimony revealed at trial in which Benjamin Smith, a cellmate of Cedric Halthon's in May 2015, testified that Halthon told Smith that Halthon "[knew] Alexander didn't do the shooting" when Halthon gave his statement to law enforcement and that Smith believed Halthon was lying when Halthon made his statement to law enforcement.  Ex. 79 pp. 3897:1–5, 3900.  But even assuming that were true, Plaintiff has not presented any evidence that Defendants knew Halthon was lying when Defendants took Halthon's statement.  "The validity of an arrest depends on what is known at the moment of the arrest, not on evidence that may be developed years later."  Phillips, 668 F.3d at 915.  Without evidence showing law enforcement knew Halthon was lying at the time or coerced Halthon into identifying

Plaintiff, the Court finds that Plaintiff cannot, as a matter of law, show Halthon's statement was fabricated.

The same is true for Plaintiff's assertion that John Ervin's statement to law enforcement was also fabricated. Plaintiff points to the following facts as evidence that Ervin's statement was fabricated: Ervin did not actually see the shooting, Detective Wilson had a conversation with Ervin between the two recorded statements, and Ervin had been a paid informant for the Danville Police Department in the past. But none of these facts establishes that Ervin's statement was fabricated. First, Ervin did not state that he saw the shooting, Ervin only stated that he saw a larger White man give another Black man a gun and then identified Plaintiff as the man who received the gun. Second, Plaintiff has not pointed to any evidence to raise a genuine issue of fact for a jury that the roughly 43-minute conversation between Wilson and Ervin led to "deliberately false testimony" or amounted to a "reckless disregard for the truth." Instead, Plaintiff's arguments amount to mere speculation, which "is insufficient to withstand summary judgment." Hart v. Mannina, 798 F.3d 578, 588 (7th Cir. 2015). Lastly, the fact that Ervin was a paid informant, "even when viewed

in the light most favorable to [Plaintiff] . . . does not negate the existence of probable cause." Purvis v. Oest, 614 F.3d 713, 723 (7th Cir. 2010) (holding that probable cause premised on the statements of a police informant, while potentially evidence of bias, does not negate probable cause, especially when the statements were corroborated by another witness).  Accordingly, Plaintiff cannot, as a matter of law, show Ervin's statement was fabricated.

## 2. Other evidence did not negate probable cause to arrest and detain Plaintiff.

Plaintiff next argues that the probable cause established was negated by other evidence.  Plaintiff argues that the positive gunshot residue on Jacob Hall, who was a passenger in the white Cadillac, negated the probable cause to detain Plaintiff.  "Hindsight is not an appropriate basis for awarding damages against the police." Phillips, 668 F.3d 915.  Rather, "[t]he validity of an arrest depends on what is known at the moment of arrest[.]" Id. Moreover, "[t]he fact that an officer later discovers additional evidence unknown to her at the time of the arrest, even if it tends to negate probable cause, is irrelevant." Reynolds v. Jamison, 488 F.3d 756, 765 (7th Cir. 2007) (emphasis added).  The positive

gunshot residue test result on Jacob Hall was not determined until November 14, 2014, eight months after Plaintiff's arrest.  PSAMF ¶ 136–138.  Therefore, the positive gunshot residue test on Jacob Hall could not have negated the probable cause to arrest Plaintiff because it was not known by the officers at the time of arrest.

Plaintiff also argues that the statements made by Halthon to Ashely Darnell regarding a man named Sadi and Halthon's trial testimony about a man named Yogi negated the probable cause to arrest and detain Plaintiff.  Ex. 62; PSAMF ¶ 104; Pl.'s Resp. pp. 55, 94.  But, while Ashley Darnell told Detective Damilano that Cedric Halthon had told Darnell that Halthon thought a man named Sadi was the shooter, when Detective Damilano interviewed Halthon, Halthon made a clear identification of Plaintiff from a six-photo array.  Ex. 25.  Moreover, at trial, Halthon actually stated that Halthon only thought the shooter "looked like Yogi and [the shooter] looked like L.C. too" and that Halthon "don't [sic] know" the shooter.  Ex. 26, 3642:14–23.

"Police need not run down all leads before making an arrest— especially not when a crime is violent and leaving the perpetrator at large may endanger other persons." Phillips, 668 F.3d at 914.

"[P]olice have no duty to investigate extenuating circumstances or search for exculpatory evidence once probable cause has been established via the accusation of a credible witness." <u>Burritt</u>, 807 F.3d at 250–251.  Here, multiple credible witnesses described the shooter in ways fitting Plaintiff's appearance that night and multiple others identified Plaintiff's photo as depicting who they thought was the shooter.  Accordingly, the Court finds that, on the facts stated and viewed in the light most favorable to Plaintiff, Plaintiff cannot show, as a matter of law, that the evidence which formed the basis of Defendants' probable cause determination was either fabricated or negated by subsequent evidence.

### 3. Plaintiff does not present evidence to show the photo arrays were unduly suggestive.

Plaintiff next argues that probable cause was not established because the photo arrays submitted to the witnesses were unduly suggestive.  "[P]robable cause can be based on a single identification from a credible witness." <u>Hart</u>, 798 F.3d at 587.  In this case, there were five identifications: from Ervin, Halthon, Timothy Liggins, Terrance Liggins, and Newell.  While probable cause from photo identifications "cannot be the product of

manipulation or coercion," no evidence of either manipulation or coercion by any Defendant has been presented.  Id. at 588.  Plaintiff instead again relies on speculation that the photos used in the arrays were unduly suggestive and argues that "exposure to information after a lineup can inappropriately inflate confidence of a witness when making a later in-court identification."  Pl.'s Resp. (d/e 75) p. 65.  But speculation and later in-court identifications have no bearing on the time-of-arrest probable cause analysis at summary judgment.  Hart, 798 F.3d at 587 (quoting Morfin v. City of East Chicago, 349 F.3d 989, 1002 (7th Cir. 2003)) ("[Plaintiff] relies on speculation, which is 'insufficient to withstand summary judgment.'")  Accordingly, the Court finds no genuine issue of fact for the jury indicating the photo arrays were unduly suggestive.

### 4. Plaintiff's Brady claim is a precluded Fourteenth Amendment due process claim.

Plaintiff's lastly argues that Defendants withheld what Plaintiff alleges was exculpatory evidence required to be disclosed under Brady v. Maryland, 373 U.S. 83 (1963).  Brady provides that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material

either to guilt or to punishment." 373 U.S. at 87 (emphasis added).
While the Seventh Circuit has stated in <u>Cairel v. Alderden</u> that "a
failure to disclose exculpatory evidence <u>may</u> cause the type of
deprivation of liberty required for a <u>Brady</u> claim" in cases where a
defendant is held in pretrial custody before acquittal or dismissal,
that language is (1) non-binding dicta and (2) only speculative. 821
F.3d at 833 (emphasis added). Further, in <u>Bianchi v. McQueen</u> the
Seventh Circuit held that "[a] violation of <u>Brady</u> requires a showing
of prejudice, which can't be made" in cases where "the plaintiffs
were acquitted." 818 F.3d 309, 320 (7th Cir. 2016). The Court
finds that the <u>Bianchi</u> holding, that an acquittal forecloses a due
process <u>Brady</u> claim, is consistent with the Seventh Circuit's
decisions in <u>Lewis v. City of Chicago</u> and <u>Young v. City of Chicago</u>,
both of which held that a § 1983 plaintiff's claims may only sound
in the Fourth Amendment and not the Fourteenth Amendment's
Due Process Clause when the § 1983 plaintiff was acquitted at his
criminal trial. <u>Lewis</u>, 914 F.3d at 475; <u>Young</u>, 987 F.3d at 645–46.
Because Plaintiff's <u>Brady</u> claim is, at its core, a claim of a violation
of due process, such claim is precluded by <u>Bianchi</u>, <u>Lewis</u>, and
<u>Young</u> because Plaintiff was acquitted after his second trial and,

therefore, can neither show prejudice nor pursue a due process claim.  Bianchi, 818 F.3d at 320.  Plaintiff's Brady objection to the probable cause determination is, therefore, similarly precluded.

The Court finds no genuine issue of fact to be decided by a jury as to the probable cause determination at the time of Plaintiff's arrest.  When the undisputed material facts are viewed in the light most favorable to Plaintiff as the nonmoving party, the Court finds that actual probable cause, and certainly arguable probable cause, existed as a matter of law to arrest and detain Plaintiff on March 18, 2014.  As such, Defendants are entitled to qualified immunity as to Plaintiff's § 1983 unlawful pretrial detention claim.

### b. Because Plaintiff cannot prove a constitutional violation, the remaining § 1983 claims also fail as a matter of law.

Plaintiff also alleges that each of the Defendant Officers failed to intervene, the Defendant Officers conspired to deprive Plaintiff of his constitutional rights, and the City of Danville failed to adequately train Danville Police Department employees, all in violation of § 1983.  In each claim, Plaintiff must establish he suffered a constitutional violation as a result of Defendants' actions.  Where there is no constitutional violation established, claims of

failure to intervene, conspiracy to deprive constitutional rights, and municipal liability claims cannot be established as a matter of law. Fillmore v. Page, 358 F.3d 496, 506 (7th Cir. 2004) ("there was no constitutionally impermissible failure to intervene because there was no violation that compelled intervention"); Campos v. Cook Cty., 932 F.3d 972, 975 (7th Cir. 2019) (quoting Archer v. Chisholm, 870 F.3d 603, 620 (7th Cir. 2017) ("a plaintiff cannot bring a § 1983 claim for conspiracy to deny a civil right unless the plaintiff states an underlying claim for denial of a right")); Petty c. City of Chicago, 754 F.3d 416, 424–25 (7th Cir. 2014) (quoting Houskins v. Sheahan, 549 F.3d 480, 493 (7th Cir.2008) ("[i]t is well established that there can be no municipal liability based on an official policy under Monell if the policy did not result in a violation of [a plaintiff's] constitutional rights").

As explained above, there was probable cause to arrest and detain Plaintiff at the time, so Plaintiff did not suffer a constitutional violation. When the undisputed facts are viewed in the light most favorable to Plaintiff, the Court finds that Defendants are entitled to summary judgment as to the Plaintiff's § 1983 claims

of failure to intervene, conspiracy to deprive constitutional rights, and failure to train under <u>Monell</u>.

### c. Plaintiff's remaining state law claims are precluded by probable cause.

Defendants are also entitled to summary judgment as to Plaintiff's remaining state law claims. Plaintiff alleges malicious prosecution and intentional infliction of emotional distress under Illinois state law. Plaintiff also alleges respondeat superior and indemnification, arguing that the City of Danville is liable for any damage award granted to Plaintiff.

But like the derivative § 1983 claims, each of Plaintiff's state law claims cannot proceed in light of the existence of probable cause. Claims of malicious prosecution require a plaintiff to show the absence of probable cause. <u>Cairel</u>, 821 F.3d at 834 (citing <u>Sang Ken Kim v. City of Chicago</u>, 858 N.E.2d 569, 574 (Ill. App. Ct. 2006). Additionally, claims of intentional infliction of emotional distress resulting from an arrest are precluded by a finding of probable cause. <u>Id.</u> at 836 (quoting <u>Honaker v. Smith</u>, 256 F.3d 477, 490 (7th Cir. 2001) (holding that a plaintiff cannot prove intentional infliction of emotional distress where defendant police

officers' actions "did not depart from reasonable and ordinary police practices and thus cannot be said to be 'beyond all bounds of decency' as required for outrageous and extreme conduct under Illinois law"); McDade v. Stacker, 106 Fed.Appx. 471, 476 (7th Cir. 2004) (holding that the plaintiff's intentional infliction of emotional distress claim "fails because his arrest was supported by probable cause" and affirming the entering summary judgment for the defendant officers).

As stated above, probable cause existed to arrest and detain Plaintiff.  Accordingly, when the undisputed material facts are viewed in the light most favorable to Plaintiff, Plaintiff cannot, as matter of law, prove his claims of malicious prosecution or intentional infliction of emotional distress under Illinois state law. And as Plaintiff admits, without any underlying tort claims, Plaintiff's respondeant superior and indemnification claims against the City of Danville also cannot be proven.  Pl.'s Resp. (d/e 75) p. 100 ("Plaintiff agrees with Defendants' assertion that by their nature respondent [sic] superior and indemnification claims do not stand on their own without the showing of an underlying tort"); Towns v. Yellow Cab Co., 382 N.E.2d 1217, 1221 (Ill. 1978) ("When

an action is brought against a master based on the alleged negligent acts of his servant, and no independent wrong is charged on behalf of the master, his liability is entirely derivative, being founded upon the doctrine of respondeat superior"). Therefore, Defendants are entitled to summary judgment as to Plaintiff's state law claims.

## V.   CONCLUSION

On the undisputed material fact, when viewed in the light most favorable to Plaintiff, the Court finds that probable cause existed to arrest and detain Plaintiff on March 18, 2014. Furthermore, because at least arguable probable cause existed on the same date, Defendants are entitled to qualified immunity. As a result, Defendants are entitled to summary judgment on Plaintiff's unlawful pretrial detention § 1983 claim. Furthermore, because Plaintiff cannot show a constitutional injury, and because probable cause existed at the time of arrest, the Court finds that Plaintiff cannot, as a matter of law, prove the remaining § 1983 and Illinois state law claims. Accordingly, Defendants' Motion for Summary Judgment (d/e 71) is GRANTED, thought Defendant's Motion to Strike (d/e 79) is DENIED. The Clerk is DIRECTED to enter judgment in favor of Defendants and against Plaintiff. All remaining

deadlines and settings are terminated, and all other pending

motions are DENIED as MOOT.  This case is closed.

**IT IS SO ORDERED.**
**ENTERED: May 3, 2022.**
**FOR THE COURT**

_/s/ Sue E. Myerscough_
**SUE E. MYERSCOUGH**
**UNITED STATES DISTRICT JUDGE**